Peter J. DISABATINO, Cindy G. Disaba-
tino, his wife, Daniel J. Dominelli,
Maureen M. Dominelli, his wife,
Plaintiffs,

v.

NEW CASTLE COUNTY, a political
subdivision of the State of
Delaware, Defendant.

No. 12714.

Court of Chancery of Delaware,
New Castle County.

Submitted: Nov. 10, 1999.
Decided: March 30, 2000.
Revised: Aug. 22, 2001.

Raymond E. Tomasetti, Esquire, of Wilmington, Delaware, for plaintiffs.

John E. Tracey, Esquire, New Castle County Law Department, of New Castle, Delaware, for defendants.

JACOBS, Vice Chancellor.

In this action, which was commenced on September 10, 1992, the plaintiffs, Peter and Cindy DiSabatino (the "DiSabatinos") and Daniel and Maureen Dominelli (the "Dominellis"), seek injunctive relief and money damages against New Castle County (the "County"). Specifically, the plaintiffs seek to compel the County to issue building permits for two parcels of land that they own, plus attorney fees and costs. At issue is whether the County may validly rescind its earlier decision resubdividing the lots that the plaintiffs purchased. That rescinded authorization was the basis for the County's refusal to grant the DiSabatinos and the Dominellis permits to build their residences after they had purchased these lots, and is the reason for this lawsuit.

This is the Opinion of the Court after trial[1] and post-trial briefing. For the following reasons, I find that the plaintiffs' claim is meritorious and entitles them to relief.

## I. BACKGROUND

The DiSabatinos are husband and wife, as are the Dominellis. The County is a political body of State of Delaware, established pursuant to 9 *Del. C.* § 1101.

The parties' dispute arises from the October 14, 1977 subdivision of Penn Manor, which is a development located adjacent to Doe Run Road in Newark, New Castle County, Delaware. During the subdivision process, Note 10 was placed on the subdivision plan. That Note prohibited future subdivision for Lot # 63 in Penn Manor ("Lot 63"). No explanation was given at

---

1. Two consolidated cases were tried, the first being this action by the plaintiffs against the County. During the trial the Court dismissed the second action (Civil Action No. 15063) brought by the County against the estate of Michael DiSabatino. Dismissal was warranted because Michael DiSabatino had transferred the properties, and the relief sought by the County (to compel Mr. DiSabatino to execute a resubdivision plan) could not be obtained against his estate.

the trial for why or under what circumstances the Note 10 restriction was created.

On June 4, 1981, a resubdivision plan for Lots 62 and 64 was approved, at which point Note 10 was renumbered as "Note 8." At that time Lots 62, 63, and 64 were under the control of Dina Holdings, an entity of which Michael DiSabatino was an officer. Mr. DiSabatino signed the 1981 record of resubdivision plan which contained Note 8 prohibiting any subdivision of Lot 63.

On March 17, 1982, Dina Holdings conveyed Lot 63 to Michael DiSabatino. During the next nine years Lot 63 remained unsubdivided, but thereafter in 1991, Michael DiSabatino hired Gejza Csoltko, a professional engineer, to prepare a resubdivision plan for Lot 63.[2] Mr. Csoltko submitted a resubdivision plan for Lot 63 but did not bring the restrictive note (Note 8) to the attention of County planners, nor did his proposed subdivision plan disclose to the County planners that the plan's intent was to remove the restriction. All the plan relevantly stated was that its purpose was to subdivide Lot 63.

The resubdivision plan was assigned to Mr. Charles McCombs, a County Planning Department employee, for review. During his 10 to 15 minute review of the record plan for Penn Manor, Mr. McCombs did not uncover Note 8, nor at any time during the review process did Mr. Csoltko or Michael DiSabatino bring the existence of Note 8 to the attention of the County planners. On October 17, 1991, the County approved the resubdivision plan for Lot 63, and thereby removed the Note 8 restriction.

After Lot 63 was subdivided, the two newly created lots, Lots 63A and 63B, were sold to plaintiffs Daniel Dominelli

and Peter DiSabatino. The new lots were approximately the same size. Lot 63B is situated at the top of a hill that overlooks Lot 63A. The drainage easement that bisected the original Lot 63 impacts Lot 63A more than it does Lot 63B, and although the entirety of Lot 63 is burdened with protected wetlands, those wetlands affected Lot 63A more than they did Lot 63B.

Thereafter, at the end of 1991 the Dominellis (who knew Michael DiSabatino through Mr. Dominelli's father) purchased Lot 63A for $42,000; and Peter DiSabatino, Michael DiSabatino's nephew, purchased Lot 63B for $5,000.

Shortly after the subdivision plan was approved by to the County, and while the plaintiffs were making plans to build homes on their respective lots, Michael Mitchell, Esquire, an Assistant County Attorney, learned of the restrictive note. As a result, Mr. Mitchell returned the subdivision plan to Ramesh Batta, the site engineer who had been retained by plaintiffs, advising that the subdivision plan would not be processed and that no building permits would be issued for Lots 63A and 63B, because the original subdivision of Lot 63 was prohibited by Note 8. This action followed.

## II. THE CONTENTIONS

The plaintiffs contend that when they purchased their respective lots from Michael DiSabatino, they substantially relied to their detriment on the County's October 17, 1991 approval of the original subdivision. The plaintiffs' position is that once they purchased the resubdivided lots, the County lost any entitlement it may have had to rescind the subdivision approval by virtue of either (i) the doctrine of equitable estoppel or (ii) the vested rights doctrine.

2. Mr. Csoltko had prepared the original subdivision plan for Penn Manor, had practiced

in Delaware for 20 years, and was familiar with the subdivision process.

In the alternative, the plaintiffs argue that (iii) even if this Court finds that Note 8 remains in force, they were bona fide purchasers for value without notice of any restriction on Lot 63, and therefore should be deemed to have acquired their resubdivided lots free of the restrictions.

The defendants dispute the application of each of plaintiffs' three theories to this case, arguing that none of the conditions that trigger these doctrines is satisfied. The defendants argue that the plaintiffs will not succeed on their equitable estoppel claim for two reasons. First, a critical element of that claim—that there be an act or omission by the government—cannot be established where the government act is based on fraud or mistake. Here, the defendants argue, Michael DiSabatino fraudulently induced the County to approve the resubdivision of Lot 63, or, alternatively, the County approved the subdivision by mistake. Second, defendants argue that the plaintiffs have not established that they substantially changed their position in reliance upon the resubdivision approval. The defendants contend further that the plaintiffs' "bona fide purchaser" claim is flawed, again for two reasons. The first is that the DiSabatinos did not purchase Lot 63B "for value" because they paid only $5,000 [3] for a lot that should have been worth more than Lot 63A,

which sold for $42,000.[4] Second, the defendants insist that the plaintiffs had at least constructive knowledge that the restrictive note had originally been placed on Lot 63, because the plaintiffs would have discovered that fact had they conducted a reasonable investigation.

Because I conclude that the County is equitably estopped from rescinding its original subdivision approval, it becomes unnecessary to address the plaintiffs' alternative claims for relief.

## III. ANALYSIS

In the typical paradigm or fact pattern, the equitable estoppel and vested rights doctrines have both been applied indistinguishably in cases where landowners obtain a building permit before any litigation arises. In such cases the issue is whether a local government may apply a subsequently adopted zoning provision that restricts the use of the land for which the building permit was previously granted before the zoning ordinance was adopted.[5] This case differs somewhat from the typical fact pattern, in that no building permits have yet been issued, and the claim of estoppel rests on the fact that plaintiffs purchased the lots in reliance upon a valid resubdivision of the property into two separate lots. In these circum-

---

3. At trial, evidence was introduced that the $5,000 purchase price was not paid to Michael DiSabatino until October or November, 1996—some five years later.

4. The defendants also contend that the Dominellis did not purchase Lot 63A "for value" because the seller originally asked for $60,000 and the Dominellis paid only $42,000.

5. See e.g., Raley v. Stango, Del.Ch., C.A. No. 1047–S, Berger, V.C., 1988 WL 81162 (July 28, 1988) (landowner receives a building permit to remodel a mall into condominiums. A later zoning code amendment that would prohibit that land use creates a dispute over whether the landowner will be allowed to continue remodeling the mall); Miller v. Board of Adjustment of Dewey Beach, Del.Super., 521 A.2d 642 (1986) (Board of Adjustment denies certificates of occupancy to landowner whose cottages exceeded the maximum number of square feet allowed under resort zoning. The landowner claims that the zoning restriction is inapplicable because the cottages had been built before the zoning code was enacted.); DMDY, L.P. v. Board of Adjustment, Del.Super., C.A. No. 92A–10–005, Lee, J., 1994 WL 150082 (March 16, 1994) (Developer builds house with a 30 foot setback from the road instead of the required 40 feet, consistent with building permit issued by the County which allowed a setback of 30 feet).

stances, plaintiffs argue, the County cannot be permitted to rescind its approval of the resubdivision and deny building permits, so as to render the resubdivided lots worthless.

Although courts have sometimes applied the doctrines of equitable estoppel and vested rights interchangeably, in this case only the equitable estoppel doctrine is addressed. The claim is that the County should be equitably estopped from denying plaintiffs a permit to build homes on Lots 63A and 63B, because plaintiffs relied in good faith, and substantially changed their position, based upon the County's earlier approval of the subdivision of Lot 63. In my view, that claim is meritorious.

■ The equitable estoppel doctrine has been applied "where a landowner [is] induced to expend substantial sums in reasonable, good faith reliance upon governmental assurances (or equivalent conduct) that the landowner's intended use of the property is permitted under the zoning code, and thereafter the government attempts to thwart that landowner's plans by amending the zoning code to prohibit those very intended uses." [6] In more general terms, a local government may be estopped from exercising its zoning powers against a property owner where the property owner, relying in good faith upon some act or omission of the government, has made such a substantial change of position or incurred such extensive obligations and expenses, that it would be highly inequitable and unjust to impair or destroy rights that the landowner has acquired.[7] In such circumstances, the government authority has been held equitably estopped from applying the amended zoning regulation to the landowner. I conclude, for reasons next explained, that that doctrine is implicated here.

First, the plaintiffs have shown that they relied in good faith upon the subdivision approval. The record establishes that at the time the plaintiffs purchased Lots 63A and 63B, they had no previous involvement in the resubdivision process, and relied upon the County's own publicly filed recorded plan that subdivided Lot 63 into two separate parcels. That plan had previously been reviewed by the County's Department of Planning. Although the restrictive note on Lot 63 had also been publicly filed, the resubdivision approval caused that restriction to be removed before the plaintiffs purchased their newly resubdivided lots. In connection with the purchase, a title search had been performed during which (not surprisingly) no restrictive note was discovered.[8]

The second disputed estoppel element— an "act or omission of the government"—is also present. The relevant government act was the County's Department of Planning resubdivision of Lot 63 into Lots 63A and 63B on October 17, 1991. The defendants respond that no estoppel arises where the government act results from fraud, illegality or mistake, and that in this case the resubdivision approval was the result of (at best) a mistake or (at worst) a calculated fraud by Michael DiSabatino. As evidence of mistake, the County cites Charles McCombs' testimony that he did not observe the restrictive note on the earlier plan while performing his cursory

6. *Wilmington Materials, Inc. v. Town of Middletown,* Del.Ch., C.A. No. 10392, Mem.Op. at 5, Jacobs, V.C., 1988 WL 135507 (Dec. 16, 1988).

7. *Miller,* 521 A.2d at 645–46; *See also, Life of the Land, Inc. v. City Council of the City and County of Honolulu,* 60 Haw. 446, 592 P.2d 26, 28 (1979); *Commercial Properties, Inc. v. Peternel,* 418 Pa. 304, 211 A.2d 514, 518 (1965).

8. That the plaintiffs retained legal counsel to represent them at closing evidences their good faith in relying upon the absence of the restriction.

review. In support of its claim of fraud, the County argues that the plan was submitted by an owner (Michael DiSabatino) who must have known of the restriction because he participated in the subdivision process and signed an earlier plan that contained the restrictive note. Moreover, defendants urge, the plan was processed by an engineer who drafted the two earlier restricted plans and also was aware of the proper procedure for removing notes from record plans.[9]

■ Having reviewed the record, I conclude that the defendants have not demonstrated that the County was fraudulently induced to approve the resubdivision. Even if (*arguendo*) Michael DiSabatino and the engineer knew that the restrictive note existed and did not disclose its existence, the County has not established that either Michael DiSabatino or the engineer were required to make that disclosure. There can be no fraud on the County where the County itself creates the restrictive note and publicly files of record the subdivision plan containing that restriction. The County had imputed knowledge of its own restrictive note, and it is disingenuous for it now to claim fraud where it failed diligently to review its own records before approving the resubdivision. Where land use approval is the product of the County's own lack of diligence, the County cannot be permitted to repudiate that approval after innocent third parties, who were in no way involved in the subdivision process,[10] detrimentally rely in good faith upon the County's representation that the land was properly and unconditionally subdivided.

■ Nor have the defendants established that the approval of the resubdivision was a "mistake," that would justify rescinding its resubdivision approval. The defendants point out that Delaware law precludes the application of estoppel on that ground where the mistake is one of "legal opinion" as distinguished from a mistake of "public record."[11] But here the "mistake" was one of "public record."

In *Allen v. Folsom*, real property was purchased in reliance upon County records that failed to disclose outstanding delinquent property taxes. The Court held that the County was estopped from collecting the delinquent taxes from the new landowner, and ruled that the estoppel doctrine should apply only where the government records being relied upon are kept for the benefit of the public, result from the authorized act of a government employee, and are of a kind that interested persons would be entitled to rely upon. As then-Chancellor Quillen stated:

---

9. Charles McCombs testified at trial that, "Normally, the applicant's engineer would contact our department, either verbally or in writing, proposing a particular removal of a note on a plan. If that is the way the process starts, contact would be made back with the engineer to essentially explain the circumstances of why the note was placed on the plan in the first place, and what circumstances now exist that the developer is requesting the removal of the note. Another avenue would be for the... submission of... a resubdivision plan with supporting documentation and evidence as to why the note was there in the first place and why it should be removed." Trial Tr. at 128–29.

10. Even (as the County argues) if Peter DiSabatino did not pay the fair market value for Lot 63B, that does not alter the fact that he satisfied the requirements for equitable estoppel. Moreover, even if (as the County argues) the transaction between Peter and his uncle may not have been at arms length, that fact, without more, cannot operate to impute his uncle's knowledge of the prior restriction to Peter.

11. *Allen v. Folsom*, Del.Ch., 372 A.2d 200, 203 (1976).

"... where an agency of government undertakes an act which has one of its chief purposes to bring about the reliance of third parties, such as in supplying information to title searchers regarding unpaid taxes, then the rule of estoppel is reasonably applied." [12]

That rule fits these facts. When the County approved the resubdivision of Lot 63 and that approval was made a matter of public record, there was a "holding out" by the County that there had been a valid resubdivison—a representation upon which plaintiffs were entitled to rely.[13] The revised Record Minor subdivision plan of Penn Manor Lot 63, which was recorded in the Office of the Recorder of Deeds for New Castle County, stated that its purpose was "To subdivide Lot # 63 into two lots, Lot # 63 A and # 63 B ..." That was a mistake of public record made by the County's own employee.

■ To succeed on their estoppel claim, the plaintiffs must also show that they substantially changed their position by reason of the act of the government entity. Here, the Dominellis and the DiSabatinos substantially changed their position, by purchasing property that the County held out as validly resubdivided into two lots, Lots 63A and 63B. In addition to paying the $42,000 purchase price, the Dominellis also incurred $600 in architect fees and $600 in surveyor fees; and in addition to paying $5,000 to acquire their lot, the DiSabatinos paid approximately $1,000 for additional incidentals.

Relying upon *Raley v. Stango*,[14] the defendants argue that land acquisition costs cannot be included in a substantial reliance analysis. In *Raley*, this Court did hold that as a general rule, land acquisition costs are not expenditures that enter into the substantial reliance calculation because "land remains usable, albeit perhaps less valuable after the new restriction is imposed." [15] The Court also held that, "[t]he cost of acquiring the land is not a determinant of whether the owner has made substantial expenditures for the commencement of the planned activity on the land." [16] Importantly, however, the Court in *Raley* recognized an exception for cases where "a portion of the purchase price represent[s] a premium directly related to the intended use," because in that circumstance "the premium arguably could be considered under a substantial reliance test."

Here, the entire purchase price was related to the purchaser's intended use. The plaintiffs purchased their respective lots in a subdivision for the sole purpose of building their private residences. They would never have expended money to acquire legal title to land that could not be used for that purpose. While Lots 63A and 63B may have inherent value as raw land, that value is of no significance to these plaintiffs, who have no alternative use for those lots. In this specific case, accordingly, the entire purchase price for each lot represented a "premium directly related to the intended use" of building homes. I therefore conclude that the acquisition price(s) and incidental cost(s) may be considered in determining the amount or extent of substantial detrimental reliance, and that the incurrence of those expenses satisfies the substantial reliance requirement.

---

12. *Id.* at 203.

13. *See Dragon Run Farms, Inc. v. Board of Adjustment,* Del.Super., Stiftel, J., 1988 WL 90551 (August 11, 1988).

14. Del.Ch., C.A. No. 1047–S, Berger, V.C., 1988 WL 81162 (July 28, 1988).

15. *Id.* at 10.

16. *Id.*

■ Finally, an estoppel analysis requires an assessment of the competing equities. The plaintiffs purchased their lots almost eight years ago, believing they were legally entitled to begin building their homes thereon. To deny the building permits would deprive plaintiffs of the value of their lots, which the plaintiffs have essentially been forced to hold as tenants in common for eight years, since the County is willing to grant only one building permit for (unresubdivided) Lot 63. There is no other viable use for this land other than residential, and the plaintiffs would have never purchased the land for any other purpose.

There are also equitable considerations that favor the defendants. The County has an interest in maintaining and enforcing its subdivision code to promote orderly growth and development. As a general matter, the community is harmed by non-conformity with its land use regulations, since nonconformity undermines the County's ability to regulate land use within its borders.[17] Moreover, two adjoining neighbors testified that they relied on statements (by third parties) that the lot would not be subdivided when they purchased their lots, and a third neighbor testified that she paid a $3,000 premium for her lot. It may be concluded that those neighbors would be harmed to the extent their view of the surrounding undeveloped land is impaired by the presence of two houses (one on each resubdivided lot) as distinguished from having to view only one house on a single undivided lot.

These competing interests are not easily reconciled, but after giving them appropriate weight, I conclude that the balance of equities favors the plaintiffs. Ordinarily, conformity to the County's subdivision code is a paramount concern in order to maintain orderly land development. But here, the plaintiffs complied with the subdivision code when they purchased lots that had been resubdivided after a review by the County's Department of Planning. Moreover, if the Lot 63 resubdivision is allowed to be rescinded, the plaintiffs will become tenants in common of a single lot and will have to work out among themselves which family will receive the one building permit available for the lot—a result that may well be impracticable and that certainly is undesirable.

## IV. CONCLUSION

For these reasons I conclude that the doctrine of equitable estoppel bars the County from denying the plaintiffs a building permit for Lots 63A and 63B. Therefore, judgment will be entered in favor of the plaintiffs and against the defendants. Counsel shall confer and submit an appropriate implementing order.

---

**17.** It must be noted, however, that no evidence was introduced to show the reason why Lot 63 was prohibited from resubdivision, but not Lots 62 and 64.